The judgment of the court below is affirmed, with costs.

*Affirmed.*

---

## LE FEVRE v. CASTAGNIO.

1. Interest in profits does not necessarily make a person a partner or liable as a partner.

2. Where a person is only interested in the profits of a business as a means of compensation, he is not a partner. In such case his interest is not a property in the profits as such, but a claim against them as a fund out of which, when ascertained, he is to be compensated.

*Appeal from District Court of Ouray County.*

CASTAGNIO brought this action for work done by himself, Collitto and Wensen (the two latter having assigned their

claims for work to Castagnio), against Moffett and Le Fevre as partners. A verdict was rendered in favor of the plaintiff in the district court, and judgment entered, from which Le Fevre appealed to this court.

The complaint alleged that in October, 1877, Le Fevre and Moffett were partners, working the Yankee Boy mine under lease, and while so working as partners, plaintiff and his assignors entered into a contract with Le Fevre and Moffett to work on the mine. That they did the work, and that of the amount earned a certain amount was due and unpaid.

The defendant Moffett answered, admitting that plaintiff and his assignors worked for himself and Le Fevre; that the amount claimed was earned, but that plaintiff and his assignors expressly contracted that they would not hold him and Moffett personally for their wages, but they would look to the ore mined for their pay and have a first lien on the ore mined therefor. He further averred, that the lease on the Yankee Boy mine, under which he and Le Fevre worked, expired in July, 1878; at that time their partnership ceased; that at the time there was ore on the dump, and tools, furniture and provisions which were partnership property, sufficient to pay the said claims; that Le Fevre took possession of them, and asks that Le Fevre be compelled to satisfy the claims out of the ore, etc.

Le Fevre in his answers, among other things, denied the partnership *in toto*, and further denied that as a partner, or individually, he employed plaintiff or his assignors, or that they, or either of them, ever did work for him individually or as a partner.

The agreement between Moffett and Le Fevre, adverted to in the opinion of the court, was as follows :

" This agreement, made and entered into this twenty-third day of October, A. D. 1877, by and between Robert W. Moffett, of the county of Ouray, and State of Colorado, and Leon Le Fevre, of the county of Hinsdale, and State aforesaid, witnesseth : that the said Rob't W. Moffett, on or about the 5th

day of October, 1877, leased for the term of one year, from the owners thereof, the mining claim or lode known as the 'Yankee Boy,' situate in Mount Sneffles mining district, Ouray county, State aforesaid, for the purpose of working and taking ore therefrom; and that being without the means necessary to work to advantage the said mine, in consideration of the covenants on the part of the said Le Fevre, to be performed as hereinafter provided, hereby agrees to pay to the said Le Fevre one-fifth of all the profits that may be derived from working said mining claim during the time of his lease aforesaid; that is to say, from the 5th day of October, 1877, to the 5th day of October, 1878; and the said Rob't W. Moffett further agrees with the said Le Fevre, that he will deliver to said Le Fevre all ores that shall be taken out of said mine on the dump thereof, on the terms hereafter named, until all sums that may now be due, or that may hereafter become due to said Le Fevre for advances made thereon, shall have been fully repaid; and the said Moffett agrees and binds himself not to sell, remove, or in any way dispose of any ores from said mine, until all such advances as are herein provided for, shall have been fully repaid. And the said Leon Le Fevre hereby agrees to furnish the said Moffett, for the purpose of enabling him to advantageously work the said mining claim, the sum of twenty-two hundred dollars, or the equivalent thereof, in such merchandise or supplies necessary to the working of said mine, as he, the said Moffett, may desire; *provided*, that the said sum shall include the cost of transportation from the place where such merchandise or supplies may be purchased, to the said mine. And the said Le Fevre further agrees that he will receive on the dump of said mine, all ore that may be taken therefrom, transport the same to the town of Lake City, where the same shall be properly sampled, and that he will, after deducting the necessary cost of transportation, account to the said Moffett therefor two cents higher per oz. than the term of the schedule of prices received this day from the Ocean Wave Mining and Smelting Company of Lake City, dated

September 1st, 1877, which schedule, marked " A," is attached to, and is hereby made a part thereof; and that so soon as he shall have received ore aggregating in value the full sum of twenty-two hundred dollars, he will advise the said Moffett thereof; and it is hereby mutually agreed, that after the amount of the said advances shall have been repaid as above provided, all ores taken from the mine during the term of this agreement, shall be disposed of to the highest bidder for cash. And the said Moffett hereby agrees that during the term of this agreement he will keep and preserve a true and correct account of all receipts and disbursements for and on account of the said mine, and that he will afford to said Le Fevre at all reasonable times access thereto, and that the same shall be used in determining the amount of profit that may be made, and that being in charge of said mine, will conduct the operations thereof with the greatest possible degree of economy.

To all of which the said parties hereto, hereby bind themselves, their heirs, administrators and assigns, jointly and severally by these presents.

In witness whereof they have hereto affixed their hands and seals, at the town of Lake City, county of Hinsdale and State aforesaid, this the day and year first above written.

(Signed)     R. W. Moffett. [seal]
        Leon Le Fevre. [seal]

Signed, sealed and delivered in presence of
   (Signed)    Geo. E. Nolte."

The agreement entered into in July, 1878, and referred to in the opinion of the court, was as follows:

"This agreement made and entered into this 5th day of July, A. D. 1878, by and between all the parties, whose names are hereto attached

*Witnesseth:* That whereas, now there is due and unpaid to the following persons the amounts following their respective names, for work and labor done on the Yankee Boy lode, situated in Mount Sneffles mining district, in Ouray county, State of Colorado, to wit:

S. R. Adams, $18.25; D. D. Shea, $390.24; John Kimberlin,

Le Fevre v. Castagnio.

$45.62; B. A. Toler, $47.77; Dan. Beaton, $544.74; Ed. Maginnis, $608.10; John Castagnio, $678.32; William Moher, $606.; A. Butler, $45.75; C. W. Smith, $385.01; W. L. Morrison, $29.40; Joseph Wensen, $574.45; Antonio Collitto, $140.34; Nelson Peterson, $225.55; Gates Avery, $79.00; H. H. Closly, $13.25; Leon Le Fevre, $6,000.00; J. M. May, $94.50; J. C. Anderson, $86.00.

Said amounts being due from one R. W. Moffett for said work and labor; and whereas, the said parties instituted suit against the said Moffett for the recovery of said amounts, and having had certain ore attached in aid of said suits, and all parties being desirous of selling said ore to the best advantage, it is here mutually agreed by the parties hereto, that said suits so instituted as aforesaid, shall be held in abeyance, and that one A. G. Siddons shall be, and is hereby, in consideration of certain money by him to be raised, appointed and authorized to take possession of all said ore, and dispose of the same for the best market price, at Lake City, in Hinsdale county, State aforesaid. But the said Siddons, shall first have said ore brought to Ouray, and sampled and assayed, furnishing to any one of the parties thereto, who may be designated by the others, a duplicate of such samples or assays; and whenever the said ore is sold by said Siddons, and returns are made to him for the same, he shall pay out the proceeds thereof to the said parties whose names are hereto attached, save to himself, as follows, to wit:

First.  Upon the delivery of this agreement, he shall pay to all of said parties, save and except the said Le Fevre, twenty-five per cent. of their respective claims, as above designated.

Second.  Whenever a sufficient quantity of ore is delivered to said Siddons that will justify him in making another payment of fifty per cent., he shall pay the same out in the manner following:  To all of said parties twenty-five per cent. on the amount on their original claims, and to the said Le Fevre a like amount of money.

Third.  Whenever said ore is all disposed of, or as fast as a sufficient quantity is disposed of to justify demand of twenty-

Le Fevre v. Castagnio.

five per cent., another dividend of——shall be declared and paid, and one-half of said dividend shall then be divided equally between all of said parties save Le Fevre, in proportion to the amounts of their several claims; and the other half of said dividend shall be paid to the said Le Fevre.

It is agreed that the said Siddons shall thus continue to pay out of the proceeds of said ore, until all of said claims are paid in full, or until said ore is entirely disposed of.

The said Siddons shall be permitted to deduct from the money derived from the sale of said ore, all just and reasonable expenses and charges attending the transportation, assaying, and cost of delivering of said ore, dividing the net proceeds, as aforesaid.

And it is further stipulated and mutually agreed, that any one of the parties hereto designated by the others, shall at all times have full information from said Siddons in respect to the sale and disposition of said ore, and be at all times permitted to take samples of said ore, as the same is brought down to Ouray, and have the same assayed.

If, when all of said ore is disposed of, any amount shall remain due and unpaid to any of the said parties, this agreement shall be without prejudice to his right to take a judgment against the said Moffett for the balance unsatisfied.

It is further agreed, that when the said money shall be paid by the said Siddons, he shall return ten per cent. of the several amounts, save and except the said Le Fevre, and pay the same to M. S. Taylor for legal services.

(Signed)
LEON LE FEVRE,
DANIEL BEATON,
ANTONIO COLLITTO,
M. L. MORRISON,
JOHN KIMBERLIN,
NELSON PETERSON,
J. M. MAY,
S. R. ADAMS,
DANIEL D. SHEA,
J. H. ANDERSON.

EDWARD MAGINNIS,
JOHN CASTAGNIO,
WILLIAM MOHER,
B. A. TOLER,
JOSEPH L. WENSEN,
H. H. CLOSLY,
GATES AVERY,
G. L. BUTLER,
CHARLES M. SMITH.

During the progress of the trial, Castagnio, while being examined as a witness in his own behalf, was interrogated by his counsel, and answered as follows.

" Q. Did you ever have any conversation with the man Perdue in regard to his connection with the mine?

A. Yes, sir.

Q. You may state what it was?

To the asking of which question and the giving of this conversation, the defendant Le Fevre objected, for the reason that it was hearsay, and the conversation of a third party, and the alleged agency had not been established. But the court overruled this objection, and permitted said conversation to be given, to which ruling of the court the said defendant then and there excepted.

A. Why, one time he was up—one afternoon he came down here—there was a break in one of the trucks and he had to get jacks up there, and he was coming up along there, and when he got up there in the afternoon, he said he was tired, when some of the boys said they did not want to work all winter without getting any money; and he tell me he was there for the business to see about that ore, to see how the business go in the mine; he was there as Mr. Le Fevre's agent, and he said Le Fevre would be up here in a few days, and would pay you. He said he expected Mr. Le Fevre every day. He said nothing more at that time, and for a good while afterward. I commenced work on the last contract, and about a week before I got through I asked Jack Perdue for my pay. A week or ten days after that I quitted work, and he told me he was sorry, and that as soon as he got those sacks full of ore and taken down, he would have money enough to pay all the men; and I said I would wait until Le Fevre came over. One day after that I came down in town, about the 20th of June, and asked Jack Perdue what was the prospect for getting my pay, and he showed me a letter from Le Fevre. I gave the letter back to Jack Perdue, and do not know where it is now." *
* *.

Messrs. T. M. PATTERSON, E. L. CAMPBELL and M. B. GERRY, for appellant.

Messrs. J. W. MILLS and J. P. CASSEDY, for appellee.

ELBERT, C. J. This was an action brought by the appellee against the appellant and one Moffett, seeking to charge them as partners.

Moffett admitted and appellant denied the partnership. The written agreement between appellant and Moffett did not, in our opinion, constitute them partners either *inter se* or as to third parties. From the recitals of the agreement it is clear the parties themselves did not contemplate a partnership. Moffett had some time prior thereto leased the "Yankee Boy" mine for the purpose of working it, but was without the necessary means to work it to advantage. For the purpose of enabling Moffett to work his mine, the appellant agreed (upon the terms set forth) to furnish him with money or supplies to the amount of twenty-two hundred dollars. In consideration of these advances, Moffett agreed to pay Le Fevre one-fifth of all the profits derived from working the mine during the term of the lease. To secure Le Fevre in his advances, Moffett further agreed to deliver to him all ores taken out of the mine on the dump, until Le Fevre should be repaid all his advances.

This is the substance of the agreement, and is the common case of a merchant or other person making advances of money or goods, or both, to enable a miner to work his mine.

Le Fevre had no interest in the lease, nor any control over the working of the mine. Limitedly he controlled the ores mined, but only for the purposes of securing his advances.

It is insisted, however, that sharing in the profits made him, as matter of law, a partner as to third persons.

Interest in profits does not necessarily make a person a partner, or liable as a partner. Parsons on Partnership, 67.* To have that effect, it must be, as the books express it, an interest in profits as profits—a proprietary interest, or, as Mr. Justice Clifford says in *Buthold* v. *Goldsmith*, 24 Howard,

537, " the party must be in some way interested in the profits as principal." Or as expressed in *Harvey* v. *Childs*, 28 Ohio St. 319, " the evidence must show that the persons taking the profits shared them as principals in a joint business, in which each has an express or implied authority to bind the others."

Where a person is only interested in the profits of a business as a means of compensation, he is not a partner. In such case his interest is not a property in the profits as such, but a claim against them as a fund out of which, when ascertained, he is to be compensated.

Mr. Parsons says: " A mere payment or promise to pay out of the profit a sum of money as a specific proportion of the profits, does not necessarily constitute the payee a partner, and gives him no interest *in* the profits and no right *to* the profits, but only a personal claim against the promisor for such money or for such a share of profits after they are ascertained, and may be divided." * * * The words which the parties use, and all of them, and all the parts and provisions of their agreement, as well as its general character and their relation to each other are to be looked at, and if the whole evidence leads to the conclusion that the receiver of money took it in good faith, only as wages, or specific compensation or payment, and did not intend to acquire any interest in or any control over the business, or in the profits as they accrue, and before they are ascertained and divided, but only after they were ascertained to find in them the fund, and in their amount the measure of his payment, he is no partner nor liable as such. Parsons Part. 71* and notes.

Again he says, after reviewing all the leading authorities upon this subject : " On the other hand, we think that, notwithstanding *dicta* of immense weight apparently to the contrary, the cases show that there are but two grounds upon which a man can be liable as a partner to third parties, and that is, if a man has not been held out as a partner, he can be chargeable as such only when he holds that relation to profits, which we believe to be the ultimate test of partnership, both

Le Fevre v. Castagnio.

*inter se* and as to third parties ; that is, unless he has some ownership in or of the profits *as they accrue,* and are not yet ascertained and divided into portions." Parsons Part. 71*, note *l.*

In *Richardson* v. *Hugitt,* 76 N. Y. 55, the Court, in speaking of the profit test, says : " And here comes another exception to the rule last stated, which is, that when the person has no interest in the capital or business, and is to be remunerated for his services by a compensation from the profits, or measured by the profits, or what is to depend, as in case of seamen or other voyagers, upon the result, it has no application. Where, then, one is only interested in the profits of a business as a means of compensation, he is not a partner."

The agreement in question, while it stipulates that the appellant is to be paid one-fifth of the profits, falls clearly within the exceptions to the rule, that interest in profits involves liability as a partner. Its leading recitals and terms show its true character to be a mere contract to advance money or supplies, not as an owner, but as a creditor, relying on the ores to repay his advances, and on the profits as a fund for a compensation in lieu of interest.

The court below correctly instructed the jury as to the true character of the agreement, but left it to the jury to find whether the appellant had held himself out as a partner in such a manner as to render him liable. There was substantially no evidence to support this theory of the case, on the contrary, it appears that the appellant lived and did business in another county, and from the date of the agreement between Moffett and the appellant in October 1877, until about the 10th of July following, when the mine was closed, the appellant never visited the mine, nor does he appear to have exercised a single act of control in its management.

When, in July, the disorder of Moffett's affairs demanded his presence at the mine, he found it closed, and the appellee and other workmen in possession of and guarding the ores which they had attached for their wages.

The agreement which was then entered into by the appellant, the appellee and the other workmen, in regard to the disposition of the ores for their common benefit, affords a strong presumption that at and prior to that date the appellant had not been thought of as a partner. In this agreement he is scheduled as a creditor entitled to share the proceeds arising from a sale of the ores, and Moffett alone is mentioned as the debtor.

The testimony touching the declarations of Perdue was of declarations touching payment and not partnership, and if anything, was an undertaking to pay the debt of a third person.

This testimony, however, was not competent, as Perdue's agency for any such purpose was not established. The court erred in admitting it.

A careful examination of the record shows no evidence to support the verdict of the jury, and the court below should have granted the motion for a new trial.

The judgment is reversed, and the cause remanded.

*Judgment reversed.*