Thomson, J.,
delivered the opinion of the court.
This suit was brought by the plaintiff in error against John P. Karns, W. E. Young, Harry Walsh, and the defend *333 ant in error, Ralph Williams, as copartners, to recover from the alleged copartnership a balance of $755.13 due him for hauling ore from some time in the month of June, 1892, to the 30th of November, 1892. Williams answered, denying any copartnership between himself and the other defendants. The court tried the case without the intervention of a jury, and found from the evidence that there was a copartnership between the defendants Karns, Young and Walsh, but that Williams was not a partner or liable as such. Judgment was rendered in the plaintiff’s favor against Karns, Young and Walsh, and in favor of Williams against the plaintiff. From this judgment against him the plaintiff brings error.
At the trial the execution of the following contract was admitted:
“Articles of agreement, made and entered into this 10th day of June, 1892, by and between W. E. Young and John P. Karns, parties of the first part, and Ralph Williams, party of the second part, all of the county of Ouray and state Colorado, as follows:
“ The parties of the first part are engaged in extracting ores from what is known as the ‘ Wheel of Fortune ’ group of mines in said count}', and they agree to furnish to the party of the second part, at the city of Ouray, in said county, at'that certain concentrating mill formerly known as the ‘ Strout Concentrating Mill,’ seven (7) tons of concentrating ore each and every day during the term of this agreement from the said group of mines, or as many tons, not to exceed seven tons per day, as can be treated at the said mill.
“ The said party of the second part agrees to reduce and concentrate such ore so furnished in a good and workmanlike manner according the plan of treatment in the said mill at and for the agreed price of five dollars per ton, and agrees to treat seven tons of ore per day at the said mill, or as many tons not to exceed seven tons per day as can be treated in the said mill, and to render to the parties of the first part good and reliable assays of pulp and tailings, so as to show *334 what is the percentage of the saving, to sack all concentrates and to deliver such concentrates at said mill without any delay.
“And it is further agreed and understood by and between the parties hereto, that in case the said parties of the first part fail to furnish the said seven tons of ore from the said mines each and every day, or so much ore as is necessary to run the said mill, then and in that case the party of the second part shall have the following interest and the following terms shall be held binding on all the parties hereto the same as if made the agreement in the first instance; provided always, that in case such failure to so furnish said ores arises from any unforeseen accident, not the fault or negligence of the parties of the first part, then so long as such hinderance remains without the negligence or fault of the parties of the first part, the above terms of forfeiture shall not become operative, and it is understood that in case such accident does arise it shall be the duty of the parties'of the first part to immediately inform the party of the second part.
“ In case the parties of the first part fail or refuse to so furnish ores from said mines as aforesaid, then according to the foregoing conditions the above agreements shall cease to be binding on all parties hereto. The party of the second part shall have an undivided one fourth interest in and to all ores of the second-class that may be extracted from said mines during the term ending June 10th, 1893, and the same interest in and to all ores of the second-class that may be now or may be hereafter extracted or taken from the said mines by the said parties of the first part, and ores of the second-class shall be such ore as when sorted and separated at the mine from the rock shall run fifty ounces in silver or less per ton. The party of second part shall pay one fourth of all proper and proportionate expenses in the extraction, shipping and milling of such second-class ores up to the time that the same shall have been milled or disposed of, and the party of the second part shall receive one fourth of all profits arising from the sale of such ores. It is further agreed and *335 understood that the parties of the first part shall pay three fourths of all costs and expenses incurred, wherein the said party of the second part is to pay one fourth, and the parties of the first part shall receive three fourths of all profits arising from the sale of such ores.
“ It is further agreed and understood by and between the parties hereto that the party of the second part shall furnish under this agreement and in this contingency the said Strout mill and the cost of running the same, the rental and charges thereof shall be divided among the parties hereto as expenses in the same proportion as above stated; and the party of the second part hereby agrees in such event not to charge any rental over and above what he is compelled to pay for said mill. It is expressly understood and agreed that it is the purpose to extract the greatest amount of ore and to mill the same at the greatest profit possible.
“ All terms and agreements herein contained shall extend and continue for the period of one year from the date hereof, to wit, until June 10th, 1893, and in case the first provisions herein contained are not carried out then the following conditions and agreements shall extend for the remaining portion of the year as above fixed.
“ It is further agreed and understood that the parties of the first part shall have six days in which to begin the furnishing of ore according to the first terms herein contained.
“ In witness whereof, the parties hereto have hereunto set their hands and seals in duplicate the day and year first above written.
“ W. E. Young. [seal]
“ John P. Kahns. [seal]
“ Ralph Williams, [seal] ”
The amount of the original claim of the plaintiff was also admitted; and it was further agreed that the unpaid balance ■was largely, if not entirely, due from persons operating the Wheel of Fortune mine for freighting second-class or mill *336 ing ore from the mine to the concentrating mill; that Young, Walsh and Karns, by virtue of a lease and option upon the mine, and by virtue of an agreement among themselves, were carrying on mining operations upon the property; and that the only controverted questions concerned the relation of Williams to the others.
The evidence was that ore was not furnished as required by the contract, and that the failure was not due to any accident or cause mentioned in the contract as excusing it. Thomas Downer was bookkeeper and business manager of the plaintiff, and kept the plaintiff’s accounts and collected his bills. Having heard from some source that Williams was a partner in the business, Downer had several conversations with him while the freighting was in progress. He presented bills to Williams at different times for the hauling. The latter in one conversation objected to the bill presented, saying that it contained items that he had nothing to do with, that all he was interested in was the ore that came to his mill, — the second class ore. On another occasion, upon being presented with a bill for §700, Downer and Williams figured up the amount due on ore that was brought to the mill, and found it to be §500. This amount Williams promised to pay out of the proceeds of a car of concentrates then ready for shipment. Williams paid Downer for the plaintiff upon the bills at one time §100, and at another §200. On one occasion Williams found fault with the price that the plaintiff was charging for hauling the ore, — §2.50 per ton. Williams said this was excessive, and the work must be done cheaper, — that it ought to be done for §1.50 per ton. The plaintiff’s contract for hauling the ore was made with Mr. Young, and not with Mr. Williams.
The defendant, Williams, testified in his own behalf that after the execution of the written agreement, the other contracting parties were unable to comply with its terms in the matter of furnishing ore, and Mr. Young had an interview with him on the subject. He told Young that the agreement was objectionable to him because it did not provide a *337 fixed charge for the use of the mill to enable him to pay the rent of the building and water power, and keep the mill in repair, and furnish it with such machinery as might be needed. Thereupon it was verbally agreed between him and Young that he (Williams) should furnish the mill, pay the rent on building and water power, keep the mill in repair and running order, be allowed for this purpose $2.00 per ton on crude ore run through the mill, ship the concentrates in his own name, receive the returns, and, after deducting the expenses mentioned, and the cost of transportation of the ore, and the wages of the men at the mill and at the mine retain one fourth of what was left, turning over to Mr. Richardson, the agent of the other parties, the remaining three fourths. The disbursements for expenses were to be made under the direction of Mr. Young. The witness said that the verbal agreement was in lieu of the written one, and that he had no interest, or voice, or direction, in the working of the mine ; also that all payments by him were made under Young’s direction. The verbal agreement was made about a week or ten day's after the one in writing.
Mr. Walsh testified that he was present when the verbal agreement was made, and gave the conversation between Williams and Young substantially as Williams stated it. Karns testified that he never liad any knowledge of this verbal agreement. It was after this that the shipments of ore from the mine took place. These shipments, as well as the working of the mine, were in charge of Young. Walsh was not a party to the written contract, but seemingly acquiesced in it, and in everything that took place subsequently. There is no substantial disagreement among the witnesses.
The court found specially, as its conclusions of law, that the original agreement did not constitute a partnership among the parties, that it was abrogated by the subsequent verbal agreement, that Williams had not held himself out as a partner, and that there was no partnership liability against him.
*338 We find ourselves unable to agree with the court in any of its conclusions. The original written contract embraced two agreements, the second of which was to take effect in the event of the failure of the first. The parties operating the mine were to furnish a certain quantity of ore daily for concentration; but if they should fail to do so for any reason except unforeseen accident, an interest of one fourth in the second-class ore would immediately vest in Williams, he to pay one fourth, and the others three fourths, of all expenses of mining, shipping and milling, and the profits to be divided in the same proportions. The first of these agreements was abandoned, and the second became binding upon the parties; and, except as it may have been afterwards modified, was the only agreement between them. This agreement made the parties copartners in the second-class ore. It contained every element of a partnership. There was a community of interest in the subject-matter of the agreement. The expenses were to be borne and the profits shared by the parties in proportion to their respective interests. If the expenses should exceed the profits so as to result in a loss, then by virtue of the agreement the loss would be ratably borne. The common business embraced both the mining and milling operations. It is patent that by the terms of this agreement there was a partnership inter se.
The subsequent verbal agreement did not displace the other. We shall not discuss the right of Young, Walsh and Williams to alter the terms of the written contract without the consent of Kama, but shall, for the purposes of our decision, treat the verbal arrangement as binding upon all the parties. It is clear from the testimony that this was, and was intended to be, only a modification of the original contract. It changed the original contract in only one — and that a comparatively unimportant — particular. Williams was dissatisfied with the provision concerning the use of the mill. The rental, and the cost of running the mill, were to be divided; but there was no provision concerning repairs, or the furnishing of additional necessary machinery. These *339 were left as a burden upon Williams, and he wanted the expense distributed. He made an estimate of the cost of rent of building and water power, and of repairs and machinery, and concluded that the whole would be covered by a fixed charge of $2.00 per ton. It was agreed that this should be allowed, not against the other parties, but to -be taken out of the gross receipts, so that each party would bear his own proportion of the amount. There was no talk of superseding the written contract. There was no suggestion of change, or of desirability of change, except in that one particular feature. It is evident from Williams’ testimony that the interests of the parties in the partnership business were to remain in all respects the same as before. It is true Williams testified that the verbal agreement was in lieu of the written one; but that is only a conclusion of his own, and is not a conclusion warranted by the facts. The law draws its own conclusions uninfluenced by his. The agreement that Williams should ship the concentrates, receive the returns, and pay out the money under the direction of Young, in no way affects the partnership agreement, or the rights of the partners under it. Williams says he exacted this for his own protection, and there was no impropriety in his doing so. It would enable him to protect himself against possible default of his copartners in discharging partnership obligations. This was the part of the business allotted to him, while Young managed the mine. After a partnership has been formed, an agreement assigning particular departments of the partnership business to the several partners is not uncommon. Indeed, if the business conducted is of any considerable magnitude, it would seem that its proper management requires a division of duty; but an agreement of this kind is one of convenience only. It does not divest a partner of any power or right with which the law clothes him. There is nothing in the record from which it can be found that the original written contract of partnership was ever abandoned; and, as modified by the verbal agreement, it remained in full force until it expired by its own terms.
*340 But if we should concede to counsel that the verbal agreement was entirely independent of the other, and was intended to, and did, supplant it, we do not see wherein Williams would be benefited. The conversation which constituted it was general and not very precise, but it contemplated the carrying on of a business by the parties in which they had a common interest. It contemplated the extraction, shipment and milling of ores, for their benefit. The expenses were to be shared and the profits divided among them in certain proportions. Each had a specific interest in the profits as profits, and not as mere compensation for services. The profits to be divided were net results, — what remained after payment of all charges against the business, — and, until division, were the common property of the persons interested. A business conducted along the lines, and in the manner, contemplated by that conversation, is a partnership business pure and simple. Le Fevre v. Castagnio, 5 Colo. 564; Manville v. Parks, 7 Colo. 128; Omaha & Grant S. & R. Co. v. Rucker, 6 Colo. App. 334.
From what we have said it would seem superfluous to devote any time to the acts and declarations of Williams in connection with the business which the plaintiff was transacting, but we cannot forbear saying that he presented the appearance of a partner. He analyzed the plaintiff’s bills, and criticised his charges; he promised payment and made payments; he assumed an authority which belonged to a partner; and even if he had not been a partner in fact, his conduct would have justified the plaintiff in believing him to be such.
Our conclusions throughout are diametrically opposed to those of the trial court, and its judgment must be reversed.
Reversed.