[No. 7654.]

RICHARDSON ET AL. v. KEELY.

1. PARTNERSHIP—*Wherein It Consists—Evidence.* A partnership may be formed without intending it. Where the parties agree upon an arrangement which is, in law, a partnership, it is of no importance that they do not intend to form a partnership, or that they call it something else. Names go for nothing where inapplicable to the substance of the arrangement.   (53, 54)

McDougall and McClelland bargained for the purchase of a smelter site with a dump thereon containing values, $2,000 to be paid in cash, and the residue in annual installments of $1,000 each. Being without means they arranged with Keely and Ross-Lewin, officers of the bank, that the bank should lend them the $2,000 required for the first payment, Keely and Ross-Lewin guaranteeing the loan, and receiving in consideration of the guarantee one half the profits of the operation of the dump. Accordingly the $2,000 advanced by the bank was applied to discharge the first payment for the dump, McDougall and McClelland executing their notes for the deferred installments, the premises were conveyed to McDougall, and by him to Keely and the dump was operated for several years by McDougall and McClelland under the name of the Union Dump Co. Keely acted as treasurer of this company. All proceeds of the dump were deposited in the bank of which Keely was an officer, and all payments were made therefrom by checks, signed by McDougall and McClelland, and by Keely as treasurer. From the profits of the enterprise the note to the bank was discharged, also two installments of the purchase money, and upon checks signed by Keely, each of the associates received over $1,500. Upon the books of the Dump Co., the property was carried as an asset, and the deferred installments of the purchase money as Bills Payable. *Held* that the transaction created a partnership and that Keely was liable for the unpaid installment of the purchase money.   (48, 54)

2. ——*Individual Obligation of Partner, for a Partnership Liability,* accepted without notice of the partnership, binds the firm.   (58)

3. EVIDENCE—*Relevancy.* Action against McDougall and Keely as partners to recover an installment of the purchase money of a smelter site and the dump thereon, the legal title to which was vested in Keely. Keely denied the partnership. The complaint and proceedings had in an action instituted by Keely to restrain interference with the operation of the dump received to affect the testimony of Keely that he was not interested in the property, and held competent for this purpose.   (52, 53)

4. ——*Words and Phrases*—"Take a Flyer" means, if anything at all, to share in the proposition presented.    (56)

*Error to Denver District Court.*—Hon. HARRY C. RIDDLE, Judge.

Messrs. MCBETH & MAY, for plaintiffs in error.

Messrs. HUGHES & DORSEY, Mr. BARNWELL S. STUART, and Mr. JOHN Q. DIER, for defendant in error.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This action was instituted by the Boston and Colorado Smelting Company, against Hugh McDougall, Hugh R. McClelland and Thomas Keely.

The plaintiff corporation was dissolved prior to the trial and the statutory trustees substituted.

The complaint alleges that prior to the year 1898, the plaintiff was the owner of a smelter site, upon which it had formerly operated a smelter, and upon which there was a large amount of slag containing metal values; that the plaintiff proposed to McDougall and McClelland to sell them the site with the slag for the price of $5,000, of which $2,000 was to be paid in cash, and the remainder in three yearly installments of $1,000 each.

It is then alleged that thereafter and about the 20th day of June, 1898, McDougall and McClelland entered into a partnership agreement with the defendant Thomas Keely and one George E. Ross-Lewin, since deceased, under the terms of which Ross-Lewin and Keely were to advance or cause to be advanced the $2,000 required for the cash payment required, and the property was to be worked for the common interest of all the partners equally; that after the payment of the $2,000 so to be

advanced, and all cost of operation together with the
proposed deferred payments, the profits if any, were to
be equally divided between the four partners, and that,
on the same day, the premises were conveyed by the
defendant McDougall to the defendant Keely, to be by
him held in the interest of the partnership. That the
parties proceeded to work the slag dump, and out of the
profits paid the $2,000 so advanced, and two of the de-
ferred payments, and also paid to each of the four part-
ners $1,591.93 as profits; but that the third deferred
payment of $1,000 was not paid; and prayed judgment
for this sum against McDougall, McClelland and Keely.

McClelland died pending the suit and was dismissed
as a party. Judgment was rendered against McDougall
by default. Keely denied the partnership, and this is
the sole question presented for consideration. The trial
court found for Keely.

There is but little dispute as to the facts. It ap-
pears that at the time, McDougall and McClelland had
obtained from the smelting company a proposition for
the sale of the property upon the terms stated, Ross-
Lewin was the vice-president, and Keely was the cashier,
of the First National Bank of Denver. McDougall and
McClelland went to Ross-Lewin to secure a loan from
the bank of the two thousand dollars with which to make
the cash payment. After talking the matter over Ross-
Lewin called Keely in. Both officers of the bank agreed
that it would not be advisable for the bank to make the
loan. McDougall and McClelland then represented to
Keely and Ross-Lewin that they expected to make a
large amount of money out of the deal, and proposed
to give them one-half of the profits, if the latter would
arrange for the advance of the necessary two thousand
dollars. Ross-Lewin suggested to Keely that they "take
a flyer," which was apparently done in manner as fol-

lows: McDougall and McClelland executed their promissory note to the bank for $2,000. Ross-Lewin and Keely as individuals joined in a letter to the bank guaranteeing the payment of the note, and as officers and acting for the bank, accepted the note and letter, and made the loan. The two thousand dollars so obtained was paid to the smelter company which executed its deed for the premises to McDougall, who in turn executed a trust deed in favor of the smelter company, to secure the remainder of the purchase price, evidenced by three notes of McDougall and McClelland, of one thousand dollars each due in one, two and three years respectively. After this, McDougall executed and delivered to Keely a deed to the premises, presumably subject to the trust deed. All this appears to have occurred on the same day.

McDougall and McClelland at once took personal charge of the operation of the property. Under an agreement of the parties an account was opened with the First National Bank, of which Ross-Lewin and Keely were officers, under the name of the Union Dump Company, into which account all receipts from the operation of the property was deposited, and from which all payments were made. Keely acted as treasurer of the Union Dump Company, and as such signed all checks drawn upon this account. From the testimony of Keely it appears that these checks were a sort of combined voucher and check, which were first to be signed and authorized by McDougall and McClelland who were in charge of the property. Keely's testimony upon this point is as follows:

"Q. No, you would not pay them until you had the other two names, as you say?

A. The signature card stated that they should be signed by Messrs. McClelland and McDougall, and then

I could complete the check by signing it and turning it
over to any body, without any investigation; in other
words I was not expected as treasurer of the company to
investigate anything; they were supposed to check up all
bills together, and pass them up to me as sort of an
auditing committee, and then I simply appended my sig-
nature to the check to complete it, so the teller would
pass out the money.''

The books of the Union Dump Company were not
introduced in evidence, but trial balances from these
books were, and to which there is no objection as to
accuracy.   These show that at all times the property
was carried as an asset of the company to the extent of
$5,000, and that the deferred payments on the property
were carried as liabilities, so long as they remained un-
paid; the account as closed showing the one item of $1,000
remaining under the head of bills payable.   It likewise
appears that each of the four alleged partners received
$1,591.93 in dividends.

The first of these trial balances is dated January
2, 1899 and the last February 22, 1904.   The $2,000 note
to the bank, and two of the deferred payments in the
sum of $1,000 each, were paid directly from the treasury
of the Union Dumping Company, by checks drawn on
that company.   Keely says the agreement was not for
one-half of the profits to himself and Ross-Lewin but for
a sum equal to one-half of the profits.   This is a dis-
tinction without a difference.   Beside the fact remains
that the dividends were paid to all alike out of the re-
ceipts from the venture and upon checks drawn upon
such fund signed by Mr. Keely as treasurer of the fund.

There is another circumstance presented by the
plaintiff viz.: the institution of a suit in the name of
Keely against the city of Black Hawk, in which the prop-
erty is situated, to enjoin the city from interfering with

such property—the pleadings in that case were excluded by the court, but the essential facts were proven orally, and the complaint tendered, is in the record.

The complaint in that case, verified by the plaintiff Keely, alleged among other things:

"That the plaintiff was at all the times hereinafter mentioned and is now the owner in fee simple and in possession of those certain pieces and parcels of land situate, lying and being in the County of Gilpin and State of Colorado, described as follows, to-wit: (Here follows a description of the property).

That the plaintiff was at all the times hereinafter mentioned and is now the owner of a large amount of goods, chattels and personal property described and known as smelter slag, which said smelter slag is of great value and contains great values of precious metals both gold and silver; that the said smelter slag was at all the times herein mentioned, has been and is now stored, piled and situate on the said premises hereinbefore described; that the said slag has an assay value of fifteen ($15.00) dollars and upwards per ton; that the plaintiff has heretofore been removing, hauling, shipping, selling, and disposing of large quantities of said slag from said premises, and has found the same to be merchantable and valuable on account of the gold and silver metal therein contained, and is desirous of continuing to sell and dispose of the remaining part and portion of the said slag, the goods, chattels and property of this plaintiff; that the plaintiff had been removing from said premises said slag and personal property for a long time, and up until on or about the 15th day of September, A. D. 1899, when the plaintiff was unlawfully interrupted and interfered with in such removals of the said goods, chattels and property, by the defendant herein, its officers, agents and employes."

This testimony was competent as tending to affect the testimony of Keely, that he was not interested in the property. Keely explains this by saying that the attorney for the Dump Company insisted that it was necessary that the suit should be instituted in his name for the reason that the record title to the property was in him.

In that action there was a prayer for injunction, and for damages in the sum of $5,000.

It must at least be regarded as surprising that a man possessing the business acumen and experience expected of the cashier of the First National Bank of Denver would lend his name and verify such statements, in a suit of that character, when he had no interest in the matter.

The question to be determined is, do the facts and circumstances as so disclosed by the record, constitute in law a partnership as affecting third persons.

It does not appear that the plaintiff at the time of the sale had any knowledge of the arrangement between the alleged partners.

It is contended that the proof does not show an intent of the parties at the time, to create a partnership, and for such reason there was no partnership. It is true there was no written partnership agreement between the alleged partners, nor does it appear that the word partnership was used, but the intent may be inferred from the acts and conduct of the partners, and clearly there was no agreement that the transaction should not constitute a partnership. Specific intent is not necessary to the formation of a partnership:

"It is possible for parties to intend no partnership and yet to form one. If they agree upon an arrangement which is a partnership in fact, it is of no importance that they call it something else, or that they even

expressly declare that they are not to be partners. The law must declare what is the legal import of their agreements, and names go for nothing when the substance of the arrangement shows them to be inapplicable. Burdick on Partnership, p. 18.''

It is also urged that a division of profits does not constitute a partnership, and *Le Fevre v. Castagino,* 5 Colo. 564, and *Baldwin v. Patrick,* 39 Colo. 347, 91 Pac. 828 are cited. This court has uniformly held that the sharing of profits does not of itself necessarily constitute a partnership. But it is the rule in all jurisdictions that the fact that a person shares the profits of a business, tends to show that he is a partner therein, 30 Cyc. 386.

It is also urged that the transaction was a mere loan of money by the bank to McDougall and McClelland upon the credit of Ross-Lewin and Keely, and therefore does not tend to create a partnership, and many cases are cited wherein loans of money were made, and a sharing of profits agreed upon in lieu of interest, and wherein it has been held that such circumstances alone do not constitute a partnership.

The rule of law upon this subject is stated in 30 Cyc. 368, to be:

''One who makes a bona fide loan of money or credit to the owner of a business, in consideration of a share of its profits in lieu of interest, does not thereby become liable to the creditors of the business, in England, or in most of the American jurisdictions. It has been held in a number of cases, however, that if the loan is a contribution to the capital of the business, or if the profits are to be shared as profits, and not as a measure of compensation for the loan, the contracting parties are partners as to third persons, although their contract denies such relationship.''

But in this case McClelland and McDougall were not engaged in the business until after the arrangement with Ross-Lewin and Keely.

The note to the bank, signed by McDougall and McClelland, together with the interest thereon at the rate of ten per cent per annum, was paid out of the proceeds of the business, before any profits or dividends were paid. Therefore this is not a case where there was an agreement to share profits in lieu of interest upon a loan.

It is insisted that there was nothing said in the agreement as to losses, and for such reason there was no partnership.

While the sharing of losses is an incident of partnership, it has been held that the right to participate in profits implies a corresponding liability for losses, and that though there is no clause in the contract saying that either party was to bear the losses, in the absence of evidence to the contrary, the law presumes that losses were to be borne by them in the same proportion in which they shared the profits. *Lee v. Cravens,* 9 Colo. App. 273, 48 Pac. 149; *Ramsay v. Meade,* 37 Colo. 465, 86 Pac. 1018.

The parties constituting the alleged partnership must be presumed to have intended the very things they did, in the conduct of the whole matter, particularly in view of the fact that it is not contended here that any one of them performed a single act without the agreement of all the others.

McDougall and McClelland had been offered the property upon the terms stated. They were without funds to make the initial payment. They applied to Ross-Lewin and Keely as officers of the First National Bank for a loan from the bank for the required amount. This was refused and they then represented to Ross-Lewin and Keely that the scheme would be profitable, and that

they would share one-half the profits, if the latter would secure the use of the money to make the initial payment for the property. Ross-Lewin and Keely accepted the proposition, and agreed to "take a flyer." If this term means anything, it means to share in the proposition. Clearly everything after this was with mutual knowledge and understanding of all the parties. On the same day McDougall and McClelland executed their note to the bank for the amount of the first payment. This was guaranteed by Ross-Lewin and Keely. Thus and thus only, was the money secured. This was paid to the plaintiff, which executed its deed to McDougall, McClelland was not included. McDougall and McClelland executed their joint notes for the deferred payments and McDougall then conveyed the premises to Keely, who continued to hold the title. But the note to the bank was paid August 25, 1898, and if the deed to Keely was to secure this loan by the bank, it should have been released or cancelled at that time. But this was not done nor offered to be done by Keely, until after the close of the partnership affairs, which continued until 1904, or more than five years after the payment of the bank note. On June 21, 1901, or nearly three years after the payment of the bank note, Keely instituted the suit against the city of Black Hawk as before stated, upon his verified complaint claiming ownership of the property. Certainly the bank could not so use a security, after the debt it had been given to secure, was fully paid.

If Keely was not holding the title for the partnership why under this state of facts did he not transfer the title to those whom he claims were the real owners, rather than to personally institute that suit.

Keely says that prior to this suit he offered to transfer the title to the plaintiff. But if he holds the title

only as security for the payment to the bank of a note
long since paid, by what right or authority can he con-
vey the premises to the plaintiff.

Counsel for defendant in error rely on and cite many
cases, wherein the division of profits have been held to
be either in lieu of interest for money loaned, or in the
nature of compensation for services rendered. It has
been shown that in the case at bar, it was not in lieu of
interest, and it was likewise not for services rendered.

No one of the four persons contributed a dollar to
the enterprise. The money with which the advance pay-
ment was made was obtained upon the joint promises
of all to the bank, in the form of a note and written
guarantee. It was obtained for the common benefit of
all—an equal division of the profits of the undertaking.
It was paid out of the profits of the enterprise. It was
the joint investment of credit to that extent.

The business was conducted in the name of the Union
Dump Company, an unincorporated association, which
under the law is held to be a partnership, whoever may
have been the parties to it.

Keely was its treasurer. The funds were kept in the
bank and under the surveillance of Ross-Lewin and
Keely. All receipts were paid into this fund. All pay-
ments, including the purchase price of the land, the debt
to the bank, expense of operation and dividends, were
paid out of this fund upon the signatures of three of the
parties, including Keely, the treasurer of the concern.
The dividends were exactly equal. It is not contended
that this was without the joint agreement and under-
standing of all.

The acts and conduct of all the parties, so appearing
from the record, clearly constitute a partnership in law:

"It is sometimes said that, in order to constitute
a partnership, the parties must have intended to assume

that relation towards each other.   But by this it is meant to say they must have intended to make such stipulation as in law constitute a partnership, and not that they intended the conclusion without regard to the conditions upon which it results as matter of law.   It certainly cannot be meant to say that, where the parties have entered into an agreement which contains all the incidents of a partnership, the mere unexpressed mental apprehension of its effect will control the legal consequences.   'If' says Lindley, 'they have in fact stipulated for all the rights of partners, an agreement that they shall not be partners is a useless protest against the consequences of their real agreement.'   1 Lindl. Partn. (5th Ed.) 11.''

It having been found that Keely was a partner, there is no serious contention as to his liability.   30 Cyc. 397.

The judgment is reversed with instruction to the trial court to enter judgment in favor of the plaintiff and against the defendant Keely for the amount found to be due.

Musser, C. J. and Garrigues, J., concur.