SLEEPING INDIAN RANCH, INC.,
a Delaware corporation,
Plaintiff–Appellee,

v.

WEST RIDGE GROUP, L.L.C.,
Defendant–Appellant.

No. 02CA2329.

Colorado Court of Appeals,
Div. III.

Sept. 9, 2004.

Certiorari Granted Jan. 31, 2005.

Traylor, Tompkins, Black & Gaty, P.C., Jerry B. Tompkins, Grand Junction, Colorado, for Plaintiff–Appellee.

Phillip Ernest Anselmo, Montrose, Colorado, for Defendant–Appellant.

Opinion by Judge GRAHAM.

Defendant, West Ridge Group, L.L.C., appeals from the trial court's judgment establishing adverse possession and quieting title in favor of plaintiff, Sleeping Indian Ranch, Inc. (SIR). We reverse.

### I. Ownership

The facts in this unusual case derive from a series of contracts for deed under which several persons occupied various portions of an 800–acre tract for a number of years without receiving formal conveyances of title.

SIR is the record title holder of a 40–acre parcel: SW1/4NE1/4, Section 9, Township 46 North, Range 7 West, N.M.P.M., Ouray County, Colorado. West Ridge is the record title holder of an adjacent 40–acre parcel due east of SIR's property: SE1/4NE1/4, Section 9, Township 46 North, Range 7 West, N.M.P.M., Ouray County, Colorado.

Robert Perkins and his friends and family previously occupied SIR's property and, treating it as their own, constructed a cabin on land abutting and overlapping the western border of West Ridge's property in 1979. This cabin and approximately three acres on which the cabin is located, referred to as tract 2 (subject property), form the basis of this appeal.

### A. Chain of Title

The subject property, located near Ridgeway, Colorado, is surrounded and encompassed by the 800–acre tract of land that was originally owned by the Holmans. On or about May 24, 1971, the Holmans entered into an installment real estate contract with Murray Gell–Mann. The contract called for a down payment and annual installments of principal and interest. The deed conveying the parcel to Gell–Mann was signed in August 1972, but was not recorded until May 1983.

Gell–Mann entered into an "Agreement of Sale and Purchase" dated May 14, 1973, with Donald D. and Judith F. Ethridge and Derrell and Charlene M. Kinney (as joint tenants). This agreement was also an installment contract requiring a down payment and annual installments of principal and interest by the Ethridges and the Kinneys. The contract was filed as an encumbrance of record on July 9, 1973. The deed conveying title to the property was signed by Gell–Mann in June 1973, but was not recorded until May 18, 1983.

On July 12, 1973, pursuant to an "Assignment and Participation Agreement," the Ethridges and the Kinneys assigned their rights under their contract with Gell–Mann to Charles C. Ashby, June M. Ashby, David G. Wood, and Raymond P. Wood. Pursuant to the Assignment and Participation Agreement, the Ethridges and the Kinneys allocated portions of the 800–acre parcel to the various assignees in exchange for the assignees "assuming the obligations" that the Ethridges and the Kinneys owed to Gell–Mann "in direct proportion to the amount of acreage which they are each going to take." The property allocated to the Ashbys was 120 acres.

In 1974, Charles Ashby approached Robert Perkins and Alfred Stuck regarding their sharing the 120–acre portion. Perkins and Stuck each agreed to "step in" to assist the Ashbys under the Assignment and Participation Agreement by each paying the Ashbys one-third of the Ashbys' financial obligation in yearly installments for their portions over a 15–year period in exchange for acquiring a 40–acre parcel. There are no

formal documents describing the arrangement.

The deed from the Ethridges and the Kinneys conveying title to the 120–acre portion to the Ashbys was signed June 17, 1988 and recorded on June 20, 1988. Meanwhile, on June 10, 1988, Charles Ashby (June Ashby having died 1976) conveyed by deed to Stuck and Perkins two 40–acre parcels within the larger 120–acre parcel. Stuck's deed was filed of record on June 10, 1988, and Perkins's deed was filed of record on June 20, 1988.

Charles Ashby conveyed his 40–acre parcel to his second wife, Emilia Vargas, by quitclaim deed that was signed in November 1984 but not recorded until June 20, 1988. Vargas quitclaimed her interest to West Ridge on April 15, 1999. The quitclaim deed was recorded April 21, 1999.

On January 10, 1990, Perkins conveyed by quitclaim deed his interest in his 40–acre parcel to certain of his friends and relatives (the Perkins Group). The Perkins Group conveyed the 40–acre parcel to SIR in June 1996 by quitclaim deed and general warranty deed.

In summary, the numerous assignors and assignees sold or assigned their interests during the period 1971–1988. The Holmans were the record owners of the entire 800–acre parcel until May 18, 1983. On May 18, 1983, Gell–Mann's deed was recorded, and he conveyed title to the Ethridges and the Kinneys that same day. The Ethridges and the Kinneys remained record owners of the property until June 20, 1988, when they signed and recorded a deed conveying title to a 120–acre parcel to the Ashbys. On that date, Charles Ashby executed two warranty deeds conveying title of a 40–acre parcel to Perkins and a 40–acre parcel to Stuck, the men who had "stepped in" to assist the Ashbys in paying installments due under the Assignment and Participation Agreement. The Ashbys' parcel is now owned by defendant, West Ridge, while the Perkins parcel is now owned by plaintiff, SIR.

### B. Perkins's Use of the Subject Property

The subject property is located on the western edge of the Ashbys' 40–acre parcel, where it meets the eastern edge of Perkins's parcel. Both Perkins and Stuck testified at trial that Ashby, Perkins, and Stuck each "owned" their respective 40–acre parcels exclusively and had no rights to the others' parcels.

Perkins testified at trial that he and members of the Perkins Group used the subject property for hunting for a couple of weeks every fall, beginning in 1974. The group originally camped in trailers on the property. Then in 1978, construction of the log cabin began. Although Perkins assured himself that he was building the cabin on what he understood to be his 40–acre parcel, the cabin was actually located on the western edge of Ashby's property. Ashby was not aware that the cabin was on his property, and Perkins testified that Ashby would not have consented to its construction there if he had known. The Perkins Group used the cabin as a hunting camp annually until 1996, when the property was conveyed to SIR. SIR, a cattle ranching company, has continued to use the cabin as a shelter and occasional lunch spot for its employees, and has maintained the area surrounding the cabin by installing culverts and cattle guards.

The trial court, after a bench trial, concluded that SIR established that the Perkins Group's use of the subject property satisfied the elements of adverse possession. The court quieted title in favor of SIR, and this appeal followed.

### II. Possession Adverse to the Vendor

As part of its appeal, West Ridge argues that the trial court erred because Perkins, as a vendee, could not have established adverse possession against Ashby, as the vendor. We agree.

 An appellate court cannot substitute itself as a finder of fact, and the factual findings of the trial court sitting without a jury are not to be disturbed upon appeal unless clearly erroneous and not supported by the record. *Gebhardt v. Gebhardt,* 198 Colo. 28, 595 P.2d 1048 (1979). The trial court's conclusions of law, in contrast, are reviewed de novo. *Haan v. Traylor,* 79 P.3d 114 (Colo.App.2003).

■ To obtain title by adverse possession, a party must establish by a preponderance of the evidence that his possession was actual, adverse, hostile, under a claim of right, exclusive, and uninterrupted for the statutory period. *Smith v. Hayden,* 772 P.2d 47 (Colo. 1989). The statutory period in Colorado is eighteen years. Section 38–41–101(1), C.R.S. 2003.

■ To satisfy the hostility requirement, the adverse possessor must demonstrate an intention to claim exclusive ownership of the property occupied. *Anderson v. Cold Spring Tungsten, Inc.,* 170 Colo. 7, 458 P.2d 756 (1969). The possessor need not have the specific intent to take property from the owner for the hostility requirement to be satisfied. *Anderson, supra.* Rather, all that is required is occupancy of the property adverse to the rights of the record holder. *Palmer Ranch, Ltd. v. Suwansawasdi,* 920 P.2d 870 (Colo.App.1996).

■ Similarly, an adverse possessor takes possession of property under a claim of right, with the intent of making the property his or her own, and not in recognition of or subordination to the record title holder. *McIntyre v. Bd. of County Comm'rs,* 86 P.3d 402 (Colo. 2004).

■ It is true that a presumption of adversity arises after the claimant demonstrates that he has been in actual and exclusive possession of the property for the statutory period. *Smith, supra.* To merit the presumption, however, the claimant's use must be "sufficiently open and obvious to apprise the true owner, in the exercise of reasonable diligence, of an intention to claim adversely." *Hodge v. Terrill,* 123 Colo. 196, 205, 228 P.2d 984, 988 (1951)(quoting *Vade v. Sickler,* 118 Colo. 236, 195 P.2d 390 (1948)). Stated differently, "proof of adverse possession must extend beyond mere actual possession and establish that the record owner has been effectively excluded, and further, that the possession relied upon is not joint." *Raftopoulos v. Monger,* 656 P.2d 1308, 1312 (Colo.1983), *overruled on other grounds by Gerner v. Sullivan,* 768 P.2d 701 (Colo.1989).

■ Consistent with these principles, a vendee cannot establish a right antagonistic to the vendor, such as by claiming the ven-

dor's property through adverse possession, or by obtaining a tax deed, until the vendee repudiates his contractual relationship with the vendor. *White v. Widger,* 144 Colo. 566, 576, 358 P.2d 592, 598 (1960)("a vendee in possession of property may not assert a superior title in himself as against his vendor").

In *Hurt v. Schneider,* 61 Colo. 104, 156 P. 600 (1916), a tenant was barred from purchasing a tax deed for the leased premises which would have established title superior to that of his landlord. *Hurt* established that equity will bar a tenant from breaching his duty of fidelity to the landlord.

> The lessee is let into possession of the demised premises, and holds them for the benefit of both the lessor and himself. During the term of the lease their interests in regard to the premises are, in many respects, identical. The relation implies a fealty on the part of the tenant to his landlord from which spring well-known legal duties not prescribed in the lease.

*Hurt v. Schneider, supra,* 61 Colo. at 106, 156 P. at 601.

Here, it may be difficult to label the interests held by the Ashbys, Stuck, and Perkins at the time Stuck and Perkins "stepped in" to the Assignment and Participation Agreement. The trial court found, with record support, that the Ashbys, Stuck, and Perkins had not established a partnership. However, the record is clear that they all entered the property under the Assignment and Participation Agreement. Therefore, they all were contractually bound to pay installments, recognizing that none of them would receive title unless and until the payment terms were met. They also knew that the Ethridges and the Kinneys held record title to the property. While Stuck and Perkins were not direct vendees, they certainly were assignees of the Ashbys, vendees, or participants and joint venturers with a vendee.

■ For the reasons expressed in *Hurt,* we conclude, as a matter of law, that the elements of adverse possession were not met under these circumstances. By "stepping in" and contributing payment to the Ashbys in consideration for his own 40–acre parcel, Perkins entered a contractual relationship that recognized the superior title of the Eth-

ridges and the Kinneys. Allowing Perkins to possess adversely against the Ethridges' and the Kinneys' interest simply through his participation with a vendee would be tantamount to allowing him to breach a duty of fidelity and to avoid his contractual recognition that he held the property for the benefit of the vendors.

The record supports Perkins's knowledge of the Assignment and Participation Agreement, whether through actual knowledge or constructive notice of the recorded encumbrance. *See Franklin Bank v. Bowling,* 74 P.3d 308 (Colo.2003). In response to the question of whether Perkins bought the property from Charles Ashby, Perkins replied, "Well that was always somewhat of an enigma. [Ashby] had made an arrangement with Derrell and Charlene Kinney to purchase 120 acres. [Ashby] wasn't in a financial position to handle payment of that 120 acres, so therefore I stepped to the plate and said I'd pick up whatever I could." Such knowledge carries with it the recognition that Perkins was required to cooperate in making installment payments so that the Ashbys could acquire title to the Ashbys', Perkins's, and Stuck's parcels.

Although SIR contends that Perkins adversely possessed the land of an adjacent landowner and therefore was not acquiring the land adversely to the vendor, the record does not support that contention. The Ashbys were not adjacent landowners until they acquired title in 1988, the earliest date that the 18-year statutory period necessary to show adverse possession could have commenced. Until that time, the Ethridges and the Kinneys held the relevant title.

We therefore conclude the trial court erred in ruling that Perkins and his successors adversely possessed the subject property.

### III. Equitable Ownership

We also reject SIR's argument that Perkins and the Ashbys became "equitable owners" of their respective 40-acre parcels in 1974 and therefore, the elements of adverse possession of the portion of the Ashbys' adjacent parcel were satisfied.

SIR presumes that the Ashbys also became equitable owners of their parcel so that Perkins could adversely possess a portion of it. SIR's argument ignores the fact that Ashby did not become the record owner of the subject property until 1988 and further assumes that such equitable ownership entitled Perkins to possess adversely against the title holders, the Ethridges and the Kinneys.

A division of this court has recognized that the doctrine of equitable conversion may cause a purchaser under a contract for the sale of land to become the equitable owner of the land for purposes of maintaining a quiet title action. *First Nat'l Bank v. McGinnis,* 819 P.2d 1080 (Colo.App.1991). A mortgage, a contract for deed, or any other instrument intended to secure the payment of an obligation affecting title to real property, however, is not a conveyance unless there is delivery of the deed to the purchaser, completely divesting the owner of his rights in the property. Section 38–35–117, C.R.S. 2003; *Tuttle v. Burrows,* 852 P.2d 1314 (Colo. App.1992). Furthermore, an unrecorded deed is not valid against a subsequent purchaser who first recorded without notice of the deed. Section 38–35–109, C.R.S.2003.

Here, the Assignment and Participation Agreement placed the Ashbys' deed in escrow, and the deed was not delivered to the Ashbys or recorded until 1988. While the Ashbys became real parties in interest when they entered into the Assignment and Purchase Agreement in 1973 so that they could have maintained a quiet title action, Ashby and his wife were not the record owners of the property until the property was conveyed by deed on June 10, 1988. Had such an action been initiated, the Ashbys might have been able to quiet title in the Ethridges and the Kinneys, but they also would have been required to join the true owners in the action and would not have been able to prevail, unless and until they proved satisfaction of the installment contract for sale under which they were obligated. *See White, supra.*

In *Leo Egan Land Co. v. Heelan,* 210 Neb. 263, 313 N.W.2d 682 (1981), a purchaser under a verbal contract of sale was put in possession by the vendor based on the purchaser's promise to pay installments. Although the purchaser acquired equitable ownership under the arrangement, the court applied the "well-settled general rule":

where one enters into and holds possession of land under an executory contract of purchase or bond for title, his entry and possession are in subordination to, and not adverse to, the rights of the vendor *or of those holding under him. In such case a privity exists which precludes the idea of a hostile tortious possession* pending the completion of the contract which can silently ripen into title by adverse possession. . . .

*Leo Egan Land Co., supra,* 210 Neb. at 267, 313 N.W.2d at 685 (emphasis added)(quoting *Gramann v. Beatty,* 134 Neb. 568, 279 N.W. 204 (1938)).

So, too, in this case, Perkins entered the property under the terms of an agreement with those holding under the title of the vendor. A privity existed that prevented Perkins from claiming anything but an interest subordinate to that of the Ethridges and the Kinneys, regardless of his equitable rights in the property.

Thus, the trial court erred in adopting a rule of equitable ownership that allowed Perkins to adversely possess against the Ashbys.

The judgment is reversed.

Judge TAUBMAN and Judge DAILEY concur.