**SLEEPING INDIAN RANCH, INC., a Delaware corporation, Petitioner,**

v.

**WEST RIDGE GROUP, LLC, Respondent**

No. 04SC691.

Supreme Court of Colorado,
En Banc.

Sept. 12, 2005.

Gregory J. Kerwin, Amanda J. Tessar, Monica K. Loseman, Gibson, Dunn & Crutcher LLP, Denver, Jerry B. Tompkins, Traylor, Tompkins, Black & Gaty, P.C., Grand Junction, for Petitioner.

Phillip Ernest Anselmo, Montrose, for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

Sleeping Indian Ranch ("SIR") sought review of the court of appeals' opinion in *Sleeping Indian Ranch, Inc. v. West Ridge Group*, 107 P.3d 1028 (Colo.App.2004), reversing the district court's judgment in its favor. The district court quieted title in SIR to a portion of a 40–acre tract of land owned by West Ridge Group ("West Ridge"), on grounds that SIR's predecessor, the Perkins Group, had acquired title by adverse possession. The Perkins Group had contracted with Charles and June Ashby for the purchase of a 40–acre tract adjacent to the parcel West Ridge later purchased. The Perkins Group entered into possession in 1974, building a log cabin that actually encroached on the property later sold to West Ridge. Concluding that the Perkins Groups' exclusive possession of the adjacent property met all the indicia of adverse possession, the district court quieted title in SIR. The court of appeals reversed, holding that the Perkins Group had entered into a venture with the Ashbys for the purchase of both parcels and one other parcel, such that the Perkins Group was actually a vendee as to Parcel B and was thus barred by the vendor-vendee

exception from asserting adverse possession against any portion of that parcel. SIR petitioned for certiorari review of the court of appeals' opinion.

We granted certiorari and now reverse.[1] The purpose of the vendor-vendee exception to the adverse possession rule is to preclude a purchaser from asserting that he can adversely possess property that he has otherwise contracted to buy. The exception does not apply here, because the evidence supports both the trial court's finding that the Perkins Group was in the process of purchasing only Parcel A, and had no contractual rights or obligations as to Parcel B, and also the trial court's finding that there was no joint venture or partnership as to the entire 120 acres. Accordingly, we reverse the court of appeals and remand for reinstatement of the quiet title decree and for other proceedings consistent with this opinion.

## I. BACKGROUND

The underlying dispute arises from the purchase and subsequent transfer of a 120–acre tract of land located in Ouray County, Colorado. The parcel was subsequently treated as three contiguous 40–acre tracts. Three different parties entered into exclusive possession of those tracts beginning in 1974: Charles and June Ashby, Alfred Stuck, and Robert Perkins (ultimately the "Perkins Group"). The parties to this dispute, SIR and West Ridge, are successors in interest to two of those owners, the Ashbys and the Perkins Group.

Asserting adverse possession, SIR filed a complaint in Ouray County District Court on October 15, 2001, to quiet title to a portion of

West Ridge's 40 acres. West Ridge moved to dismiss the complaint, contending that, for the duration of the adverse period, SIR's predecessor was a contract vendee of the Ashbys, who—under the terms of an installment land contract—did not obtain actual title until 1989. Thus, West Ridge continued, because the Perkins Group was a "vendee in possession," the adverse possession period could not have begun until 1989. West Ridge's contemporaneously filed counterclaim recognized the Perkins and Ashby parcels as distinct properties.[2] Treating West Ridge's motion as a motion for summary judgment, the trial court denied the motion, finding disputed issues of fact as to whether SIR had adversely possessed the property. Although the court recognized the principle that a vendee may not adversely possess against a vendor, the court noted that West Ridge's own pleadings established facts consistent with SIR's complaint: namely, that SIR sought to quiet title to a property distinct from the property that West Ridge's predecessor had conveyed to Perkins. The case proceeded to trial in August, 2002.[3]

Trial evidence disclosed the following title history for the 120–acre tract. The pertinent initial transaction involved a 1973 conveyance of an 800–acre tract of land located in Ridgeway, Colorado. Pursuant to an Agreement of Sale and Purchase, Murray Gell–Mann sold the parcel to Donald D. and Judith F. Ethridge (the "Ethridges"), and Darrell E. and Charlene M. Kinney (the "Kinneys").[4] The Agreement was an installment land contract, requiring a down payment and annual installments of principal and interest. The contract was filed as an encumbrance of record on July 9, 1973. The deed was signed in

1. We granted certiorari to determine:

 Whether the court of appeals erred in concluding that the beneficial owner of Parcel A is precluded as a matter of law from adversely possessing a portion of adjoining Parcel B because the beneficial owner of Parcel A purchased, or is purchasing, Parcel A for the owner of Parcel B?

2. In its counterclaim, West Ridge claimed, among other things, adverse possession of a portion of SIR's 40 acres. The trial found in favor of SIR as to that claim as well.

3. West Ridge filed a second motion for summary judgment prior to trial, on grounds of newly

discovered records evidencing a unity of title for the two parcels, resulting from a single real estate contract. West Ridge, therefore, reasserted its argument that the vendor-vendee exception barred SIR's claim for adverse possession. Noting that West Ridge had raised similar arguments in its previous motion, finding its newly submitted exhibits "confusing," and pointing to affidavits provided by witnesses for SIR challenging West Ridge's unity of title argument, the trial court once again denied the motion for summary judgment.

4. The property was conveyed to Murray Gell–Mann by Emery D. and Beatrice Holman in 1971 pursuant to a real estate contract. The deed for this conveyance was recorded in 1983.

June of 1973, but under the terms of the Agreement, was not recorded until 1983—when the purchase price was paid in full. In 1973, the Ethridges and Kinneys entered into possession as joint tenants.

The same year, Charles C. Ashby and June M. Ashby (the "Ashbys") contracted with Ethridge and Kinney to purchase a 120 acre parcel through an "assignment and participation" agreement, under which the Ashbys assumed the Ethridge and Kinney obligations to Gell–Mann in proportion to the 120–acre tract.

A year later, Charles Ashby was having problems making the payments. He sought assistance from two friends, Robert Perkins and Alfred Stuck, also his business associates.

The nature of the Ashby, Perkins and Stuck transactions are at the heart of this case. Only Robert Perkins and Alfred Stuck provided testimony at trial. Both testified that in 1974 (or in that time frame), they entered into separate installment land contracts with the Ashbys to purchase 40 acres each of the 120–acre parcel, with the Ashbys retaining 40 acres. Although Perkins remarked that his purchase of the property "was always somewhat of an enigma," he asserted that he and Stuck had purchased distinct contiguous 40–acre tracts at $212 per acre (or one-third of the Ashbys' financial obligation) to be paid over a ten or fifteen-year period.

The real estate sales contracts between Ashby, Stuck and Perkins were, however, never memorialized. Although Perkins testified that he had received some documents from Ashby defining payment terms for 40 acres, there was no document precisely defining the arrangement introduced into evidence at trial. However, both Stuck and Perkins testified that the transaction was settled by "handshakes" among friends who had known each other for several decades. Both were quite clear that the intent of the parties was that Stuck, Perkins and Ashby would each end up with separately apportioned 40–acre parcels. To that end, Stuck and Perkins made separate payments to Ashby during the installment period.

Trial exhibits consisted primarily of correspondence between Ashby and Perkins, and between Perkins and those who shared ownership and possession of his parcel. The correspondence included a certificate of limited partnership of "Uncampahgre, Ltd.," identifying Ashby, Stuck and Perkins as partners. Other correspondence included a 1974 letter from Perkins to Ashby referencing notice to be sent to "those other parties who are involved in our 40 acres" for annual payments, and letters from Charles Perkins sent solely to members of the Perkins Group for their contributions to the construction of and improvements to the log cabin.

The "partnership" document sheds some light on the transaction. One page contained a sketch designating the parties to whom the Kinneys and Ethridges had sold separate portions of the 800–acre parcel. Specifically, in the area reflecting the 120–acres the Ashbys were purchasing, three separate portions are sectioned off. The westerly most section is marked "S. ASP," the middle section is marked "P. ASP," and the easterly most section is designated "A. ASP." On a preceding page, the document reflects that the 120–acres had been allocated as follows: (1) the SE 1/4 NW 1/4 Sec. 9, allocated to Dr. Stuck; (2) the SW 1/4 NE 1/4 (hereinafter "Parcel A"), allocated to Perkins; and (3) the SE 1/4 NE 1/4 Sec. 9 (hereinafter "Parcel B"), retained by the Ashbys. The document specified that the partnership was established for the purpose of purchasing the 120 acres. Nonetheless, evidence at trial indicated, and the trial court expressly found, that no partnership had been actually created. There was no testimony or other evidence about contributions to any partnership, partnership tax returns or any other indicia of a formalized partnership.

Concurrent with his agreement with the Ashbys, in 1974, Perkins transferred Parcel A to an evolving group of eight business associates, family members and friends referred to as the "Perkins Group". This transaction was also not recorded. The Perkins Group paid taxes on Parcel A from 1981 until the sale to SIR. From 1974 until 1996, the Perkins Group used the parcel as co-tenants.[5]

---

**5.** Perkins disclosed that each possessed a one-seventh or one-eighth percentage interest in the

property, but the property was never physically

From the beginning, the Perkins Group used Parcel A solely for hunting purposes. Initially, some members of the group lodged at the Kinneys' property, while others camped out at Parcel A. In 1975, a camper trailer was placed on the property. The group began staying exclusively at Parcel A the following year when a sheep herder's tent was added to the property. They added a second trailer in 1977.

In 1976, the Perkins Group began construction of a cabin on Parcel A. Prior to building the cabin, Charles Perkins and another member of the group attempted to mark the boundary line between their property and Parcel B, by stepping off 30 paces to the west to avoid encroachment. Assuming the boundary had been properly marked, construction on the cabin was completed by 1978. The group strung barb-wire around the cabin and constructed a generator shed and an open-air outhouse in the vicinity. They continued to use the property as an annual hunting camp, recreation area, and horse corral until 1996 when the property was sold to SIR. The parties did not discover that the boundaries had not been properly marked, and that the cabin encroached on Parcel B by 250 feet, until the time of that sale. West Ridge would later purchase the Ashby property in 1999.

At the close of trial, the court quieted title in SIR, first rejecting West Ridge's argument that unity of title defeated SIR's assertion of adversity. The court held that SIR's predecessors had held "equitable ownership" of their 40 acres since at least 1974. Recognizing that a vendee may not adversely possess against a vendor, the court concluded, however, that because SIR did not seek adverse possession over Parcel A, the parcel included in its contract with the Ashbys, the vendor-vendee principle was inapplicable. The court was persuaded that, although legal title in the entire 800–acres was held in a common name until 1988, the Perkins Group had a separate and distinct 40–acre parcel as did Stuck and the Ashbys. Furthermore, the court acknowledged "discussions of partnerships" and a common agricultural lease executed by Ashby, Stuck and Perkins; but it "could not conclude that there was a partner-

ship as to the 120 acres." The court lastly dismissed West Ridge's argument that adverse possession was defeated by Robert Perkins' lack of intent to encroach upon the boundary line, concluding that adverse possession required only intent to claim exclusive ownership. According to the court, construction of the cabin met that element. The court therefore issued a decree quieting title in SIR as to 3.7 acres of Parcel B, now owned by West Ridge.

The court of appeals reversed in a published opinion. *See Sleeping Indian Ranch, Inc. v. West Ridge Group,* 107 P.3d 1028 (Colo. App.2004). The court acknowledged that when Perkins "'stepped in' to the Assignment and Participation Agreement" with the Ashbys, he was neither a partner nor a direct vendee; however, the court of appeals opined, "While Stuck and Perkins were not direct vendees, they certainly were assignees of the Ashbys, vendees, or participants and joint venturers with a vendee." *Id.* at 1031. The court of appeals reasoned that Perkins had a "duty of fidelity" and a contractual obligation to recognize that he held the property for the benefit of the vendors. *Id.* at 1032. Both obligations, in the court's view, prevented Perkins from adversely possessing against the Ashbys. *Id.*

The court also rebuffed the trial court's conclusion that equitable ownership vested in 1974. *Id.* Citing evidence that the Ashbys did not become the record owners of the adverse property until 1988, the court stated that the proposition "assumes that such equitable ownership entitled Perkins to possess adversely against the title holders, the Ethridges and the Kinneys." *Id.* According to the court, because "Perkins entered the property under the terms of an agreement with those holding under the title of the vendor, ... [a] privity existed that prevented Perkins from claiming anything but an interest subordinate to that of the Ethridges and the Kinneys, regardless of his equitable rights in the property." *Id.* at 1033.

SIR petitioned from the court of appeals' opinion, contending that because it had purchased Parcel A, a property distinct from Parcel B, the vendor-vendee exception could

apportioned. Each member of the group had

equal access to the entire 40 acres.

not bar SIR from establishing adverse possession to Parcel B. We granted the petition and now reverse.

## II. ANALYSIS

 The issue we address in this case is narrow. We are not concerned with whether SIR established all of the factual predicates of adverse possession. Rather, we address solely the question of whether the nature of Robert Perkins' transaction with the Ashbys was such that the vendor-vendee exception precluded the group from establishing a claim of title adverse to the Ashbys. We conclude that it does not. The record supports the trial court's finding that from at least 1974 onward it was "clear that the Perkins Group had a separate and distinct 40–acre parcel as did Dr. Stuck, as did Mr. Ashby." The purpose of the vendor-vendee exception to adverse possession is to prohibit someone from avoiding a contractual obligation to pay for property by adversely possessing it. Here, the Perkins Group was purchasing only its particular 40–acre parcel and was therefore not precluded from asserting a claim of adverse possession against a separate parcel as to which it had no contractual rights or responsibilities.

## A. Vendee's assertion of adversity against vendor

 Adverse possession occurs where possession of specific property is inconsistent with the true owner's rights and is accompanied by certain acts, including hostility. *See* 10 *Thompson on Real Property* § 87.01 at 75, 77 (David Thomas ed., 2d ed. 1998 & Supp.2004) (indicating that every state has adverse possession legislation). Running alongside that precept, however, is the tenet that a vendee in possession of property may not establish adverse possession against his vendor under an executory contract. *See White v. Widger,* 144 Colo. 566, 576, 358 P.2d 592, 598 (1960); *Stansbury v. Taggart,* 3 McLean 457 (C.C.Ohio 1844) (citing general rule); 4 Herbert T. Tiffany, *The Law of Real Property* § 1183 (3d ed. 1975 & Supp.2004) (possession by vendee of land under an executory contract of sale prevents adverse possession so long as the purchase price has not been paid). Some states permit the vendee to assert adversity only when the contract

was been repudiated, while others require that the vendee surrender any title under the contract before he can pursue adverse possession. *See Widger,* 144 Colo. at 576, 358 P.2d at 598; 3 Am.Jur.2d *Adverse Possession* § 189 (2005). *But see* 2 Cal. Jur.3d *Adverse Possession* § 763 (suggesting vendee under an executory contract may assert adversity whether or not contract is repudiated by unequivocally manifesting hostility brought expressly to the vendor's knowledge or of such character as clearly to charge the vendor with knowledge).

The rule is supported by numerous policy justifications. Mainly, the purchaser under an executory contract of sale cannot establish the "hostility" element of adverse possession because the purchaser enters into possession with the permission of the seller. *See* 3 Am.Jur.2d *Adverse Possession* § 189; *see also* E.L.D., Annotation, *Adverse Possession as against Vendor by one who Enters Under Executory Contract,* 1 A.L.R. 4th (2004) (hostility being one of the elements necessary to establish adverse possession, it follows that the vendee under an executory contract cannot prove adverse possession). In addition, the rule is born of concern that a vendor would otherwise have no recourse against a vendee who reneges on payments after entering into and remaining in possession for the installment period. *See Owens v. Bartruff,* 297 Or. 610, 687 P.2d 1072, 1074 (1984). Along those lines, the vendee is presumed subservient to the rights of his vendor and thereby equitably estopped from claiming that his possession is adverse. *See* Tiffany, *supra,* at § 118.

The question of whether a vendee may assert adverse possession against his vendor as to property not covered by the contract is a matter of first impression for this court, but other courts have addressed it. As early as 1878, one court recognized the vendee's right to assert ownership by adverse possession over a tract of land not covered by the contract. *See Schneider v. Botsch,* 90 Ill. 577 (1878) (holding that one who takes possession of a lot under a contract of purchase holds adversely that portion of land which is erroneously included with his lot by erection of fence). Other courts followed suit. *See Ors-*

*born v. Deep Rock Oil*, 153 Tex. 281, 267 S.W.2d 781, 801 (1954) (recognizing "the well established rule that a vendee may acquire title by adverse possession of additional or adjoining land outside the limits of the boundaries of his conveyance"); *Consol. Water Supply Co. v. State Hosp.*, 66 Pa.Super. 610 (1917) (vendee may acquire by adverse possession, title to land not included in his deed). Adopting that concept, the Oregon Supreme Court made clear that "the hostile nature of possession of other land owned by the vendor, which is not included in the sale, is not diminished by the mere fact that it is the vendor who owns it." *Owens*, 687 P.2d at 1074. The court explained that proposition by way of the following illustration:

> [I]f A, owner of two non-contiguous parcels of land, Blackacre and Whiteacre, sold Blackacre to B, and B possessed White-acre adversely, there is nothing inherent in the vendor-vendee relationship which would affect B's adverse possession of Whiteacre against A.

*Id.* at 1075 n. 5. The court held that even possession under mistaken belief of boundary line met the requirement and it "discern[ed] no distinctions" where the parcels are contiguous. *Id.*

Just as the principle barring a vendee from asserting adversity against the vendor is based in common sense and practicality, so too is it logical to restrict the principle to property defined by the parties' agreement. After all, the purpose of the rule is to protect the seller's interest in the land sold. The purchaser is therefore not a "vendee in possession" of land not included in the contract.

■ Turning to this case, if the Perkins Group adversely possessed property different from that which it had contracted to purchase from the Ashbys, it was not a vendee as to that property and the vendor-vendee exception does not apply. The remaining question is whether the Perkins Group in fact contracted to purchase only the 40–acre tract, Parcel A, or whether the Perkins Group was implicated in the purchase of the whole 120–acre tract that was under contract to the Ashbys.

### B. Application

The court of appeals held that SIR's predecessor in interest was a vendee of the Kinneys and Ethridges as to the 120–acre tract sold to the Ashbys. The court relied upon two findings: first that the record title was not split into 40–acre parcels until much later, and the lack of record title precluded the Ashbys from selling individual portions to Perkins; and second that Perkins entered into a joint venture with the Ashbys to purchase the 120–acre tract, which caused Perkins to be a vendee as to the entire 120 acres. We consider each proposition in turn.

### 1. Absence of formal title

■ The complication in this case arises out of the fact that the Ashbys purchased the property from the Kinneys and Ethridges under an installment land contract under which the Ashbys made annual payments to the vendors for a specified period. Installment land contracts were common instruments of financing at one time. Mortgages and Deeds of Trust have replaced them in the marketplace for the most part at present. Thinking of an installment land contract as a secured financing arrangement makes the analysis clearer. The sellers held the title in escrow pending fulfillment of contract terms. The purchaser assumed possession of the realty and the rights and responsibilities of ownership while the seller retained the legal title until the contract was paid in full. *See* § 38–35–126, C.R.S. (2004); *see also* 17 Richard A. Lord, *Williston on Contracts* § 50:42 at 417 (4th ed. 2000 & Supp.2004) (characterizing installment land contracts as executory contracts).

Most jurisdictions abide by the principle that upon contracting for the purchase and sale of land, the vendee is the owner in equity of the land, and the seller merely holds legal title as security for the payment of the purchase price. *See* Lord, *supra* at § 50:42. Even more, the "equitable ownership of realty is regarded by equity as the real ownership." Thompson, *supra*, at § 14:02; *see also* § 38–41–108, C.R.S. (2004) (addressing requirements for legal title). Consequently, under the installment land contract, the vendor's interest is classified as

"personalty," that is, he retains no interest in the real property and "cannot give a valid deed or mortgage of the property to one having knowledge of the vendee's equities." Lord, *supra*, at § 50:42; *see also Cannefax v. Clement*, 786 P.2d 1377 (Utah App.1990) (the vendor's interest is personal property not subject to judgment liens; and the vendee's interest is real property subject to judgment liens).

It is in fact established in this jurisdiction that the execution of a contract to purchase land causes an equitable conversion of the purchaser's contractual interest into an equitable interest in the realty itself. *See First Nat'l Bank of Wray v. McGinnis*, 819 P.2d 1080, 1083 (Colo.App.1991) (citing *Dwyer v. District Court*, 188 Colo. 41, 532 P.2d 725 (1975)). Accordingly, mortgages, deeds, or other *instruments intended to secure payment* of an obligation affecting title to realty are deemed to be liens on the property. § 38–35–117, C.R.S. (2004). In sum, the vendee's interest under the contract is considered realty so that the vendee is entitled to all benefits attaching to the property, and unless the contract indicates otherwise, he assumes all responsibilities or losses as well. *See Buck v. McNab*, 139 So.2d 734 (Fla.App. 1962). Such benefits might even include resale of the property at a substantial profit, inuring to the vendee. *See Thompson, supra*, § 100.06 (purchaser has a right to transfer either through assignment of the original contract or resale of the purchaser's interest by means of a new contract).

West Ridge does not dispute that the Kinneys and the Ethridges were vendors of 120 acres and that the Ashbys were vendees under an installment contract. Based upon our precedent, at the time of the execution of the contract, the Ashbys became the equitable owners of the land, possessing all the incidents of ownership. *See McGinnis*, 819 P.2d at 1083. As holders of the naked title, the Ethridges and Kinneys retained an interest in the property, entitling them to seek relief upon the Ashbys' default. *See Thompson, supra*. The Ashbys were not precluded from transferring their interests under the contract. One who contracts to purchase land may assign his rights or may contract that he or she will acquire title and then transfer it; *such agreement operates as a*

*conveyance of the purchaser's equitable title.* See Lord, *supra*, § 50:43.

Thus, Ashby had the authority to enter into a conveyance. The next question then becomes whether Ashby entered into one conveyance of 120 acres to a joint venture, of which Perkins was a part—or whether Ashby entered into three separate conveyances for 40 acres each.

## 2. Partnership or joint venture

Although this case is complicated by the lack of a written contract defining the precise nature of the agreements the Ashbys entered into with Perkins and Stuck, the record sufficiently supports the trial court's conclusion that Ashby, Stuck and Perkins had entered into separate contracts for the sale of two 40–acre tracts and that no partnership or joint venture was in place.

 First, the record does not support the proposition that Perkins and Ashby were "joint venturers." We set forth the requirements for joint ventures in *Realty Dev. Co. v. Feit*, declaring, first, "A joint adventure cannot arise by mere operation of law, its legal force being derived from voluntary agreement of the parties either express or implied." 154 Colo. 44, 45, 387 P.2d 898, 899 (1963). Thus, we adopted the following three elements for determining whether a joint adventure relationship exists, emphasizing that no one element alone is sufficient: "(1) [t]here must be joint interest in the property by the parties sought to be held as partners; (2) there must be agreements, express or implied, *to share in the profits and losses of the venture;* and (3) there must be actions and conduct showing co-operation in the project." *Id.* (the key element is joint "and not [ ] several profit[s]") (emphasis in original) (internal quotations omitted); *see also Breckenridge Co. v. Swales Mgmt. Corp.*, 185 Colo. 160, 163–64, 522 P.2d 737, 739 (1974). Importantly, "the pooling of property, money, assets, skill, or knowledge does not create the relationship of joint venture in the absence of intent as manifested from the facts and circumstances involved in each particular case." 46 Am.Jur.2d § 12 (2005).

In the instant case, the record reflects correspondence from the Ashbys referring to the "Uncompahgre Partners." Furthermore, other trial exhibits included a certificate of limited partnership of Uncompahgre, Limited, identifying Ashby, Perkins and Stuck as the members of the partnership. A separate letter written by June Ashby began with "Dear Partners" and referred to a grazing lease signed by Charles Ashby's second wife and dated January 1, 1990. On the other hand, there is absolutely no evidence of financial sharing of profits, losses or expenses. The trial court commented that "there was no testimony to suggest contributions to any partnership, no partnership tax returns or any other indicia of a formalized partnership."

No evidence emerged at trial indicating the parties had a joint interest in the entire 120 acres, that they entered any express or implied agreements to share profits, or that there existed a single undertaking in the use of the land to which each showed cooperation. Even if the evidence of the grazing lease proved to be a project from which all three parties obtained profit, under *Feit,* establishing that lone element, although fundamental, does not prove that a joint venture had been established.

Robert Perkins testified that he intended to acquire Parcel B for the sole purpose of hunting. He testified that he and members of his group hunted and stayed on Parcel B only. The Ashbys never ventured onto the property at all. Perkins and his group never intended to derive any profits from the land. The group used the property exclusively for hunting and other recreational purposes for the entire adverse period. Moreover, the written communications would indicate that their only connection with the Ashbys over the years concerned the scheduled annual payments for Parcel A. Thus, the evidence does not establish a joint venture for the purchase of the 120 acres from the Kinneys and the Ethridges.

Second, in construing contracts for sale of realty, we observe the cardinal rule that the parties' intent controls "and, once such intent is determined, that it then be given force and effect, if such can be done consistently with legal principles." *Fellers–Schoonmaker Homes, Inc., v. Five Star Homes and Real Estate, Inc.,* 158 Colo. 163, 170, 405 P.2d 677, 681 (1965).

The record indicates that in "stepping in" to assist the Ashbys to purchase 120 acres of land from the Kinneys and Ethridges, Perkins entered into an oral agreement with the Ashbys to assume the obligation for 40 acres.[6] Perkins and Stuck *both* testified that they understood from the beginning that each was purchasing a separate and distinct 40 acre parcel. Correspondence from the Ashbys in fact described individual tracts with specificity: (1) the SE 1/4 NW 1/4 Sec. 9, allocated to Stuck; (2) the SW 1/4 NE 1/4, allocated to Perkins; and (3) the SE 1/4 NE 1/4 Sec. 9, retained by the Ashbys. In one letter from Perkins to Charles Ashby, he refers to communications to members of his group about payments for "our 40 acres." In addition, Perkins testified he and his Group were charged $212 per acre, for which they were to make annual installments for fifteen years.

That Ashby did not quitclaim the deed and title to Perkins until 1988 is of little consequence since the absence of legal title did not hinder the Ashbys' right to transfer their interest. Moreover, the record indicates that the deed and title were transferred pursuant to the parties' 1974 contract. Two different deeds for 40 acres each were quitclaimed to Stuck and Perkins separately. Those deeds represented the final step in the fulfillment of the 1974 subcontract for sale of land and a later transfer of title upon fulfillment of contract terms.

Thus, because Perkins entered into an independent contract with the Ashbys to pur-

---

6. We are not concerned here with whether an oral agreement for the sale of land is within the statute of frauds since the contract has been fully performed; and in any event, correspondence by Ashby acknowledging payment terms could take the contract out of the statute. *See* § 38–10–108, C.R.S. (2004) (declaring every contract for the sale of any lands or any interest in lands void

"unless the contract or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party by whom the sale is to be made"); *see also Babcock v. Bouton,* 85 Colo. 327, 275 P. 908 (1929) (the statute is inapplicable when performance of contract is shown).

chase Parcel A alone, Perkins was not a purchaser as to Parcel B, and as such the vendor-vendee exception does not operate to defeat adverse possession.

## III. CONCLUSION

We conclude that the Perkins Group, through Robert Perkins, purchased a 40–acre tract, Parcel A, from the Ashbys, and later established adverse possession over a portion of the Ashbys' tract, Parcel B. Therefore, the Perkins Group was not barred from asserting adverse possession over Parcel B. We therefore reverse the court of appeals' opinion and remand for reinstatement of the trial court order quieting title in SIR and for further proceedings consistent with this opinion.

Chief Justice MULLARKEY, dissenting.

As a matter of law, adverse possession could not have taken hold had the three groups of friends who were in possession of the 120 acres at issue from 1974 to 1988 been engaged in a joint venture. As the majority correctly states, this court established the legal standard for the formation of a joint venture in *Realty Dev. Co. v. Feit*, 154 Colo. 44, 45, 387 P.2d 898, 899 (1963):

(1) There must be joint interest in the property by the parties sought to be held as partners; (2) there must be agreements, express or implied, *to share in the profits and losses of the venture;* and (3) there must be actions and conduct showing co-operation in the project. *None of these elements alone is sufficient.*

(emphasis in original).

The majority finds that the *Feit* test was not met in this case.[1] In my opinion, the trial record shows that the three parties, Charles and June Ashby, Al Stuck, and Bob Perkins (who later represented the "Perkins Group") owned the 120 acre parcel at issue as a joint interest, sharing in profits and losses, and acting in a cooperative manner. For this reason, I respectfully dissent.

I begin by recognizing that the formation of a joint venture does not require a written agreement; it can be established by the conduct of the parties. *Richardson v. Keely*, 58 Colo. 47, 55–57, 142 P. 167, 170 (1914); *Hirschfeld Press, Inc. v. Weston Group, Inc.*, 824 P.2d 44, 46 (Colo.App.1991), *aff'd, Weston Group, Inc. v. Hirschfeld Press, Inc.*, 845 P.2d 1162 (Colo.1993); *Stratman v. Dietrich*, 765 P.2d 603 (Colo.App.1988). A joint venture is governed by the substantive law of partnerships. *Hooper v. Yoder*, 737 P.2d 852, 857 n. 4 (Colo.1987); *In re S & D Foods, Inc.*, 144 B.R. 121, 158 (Bankr.D.Colo.1992).

Although Perkins's intent is relevant, it is not dispositive. A partnership or joint venture may be formed without the parties expressly intending it. *Common Sense Alliance v. Davidson*, 995 P.2d 748, 762 (Colo. 2000) (Scott, J., dissenting) ("A partnership is formed upon 'the association of two or more persons to carry on as co-owners of a business for profit' regardless of whether the partners formalize their agreement with a written document.") (quoting § 7–64–202(1), C.R.S.)[2]; *Richardson*, 58 Colo. at 55–57, 142 P. 167.

The majority's analysis turns on two factors. First, it concludes that Perkins did not intend to participate in a joint venture involving the entire 120 acre parcel. Rather, Perkins only intended to use his 40 acres for hunting and recreation. Second, the majority finds there was an oral contract between Perkins and the Ashbys, that Perkins was purchasing a distinct 40 acre parcel. Maj. op. at 1070–71. This analysis is not persuasive for two reasons. First, Perkins's testimony about his subjective intent is not dispositive of the joint venture issue. Second, the trial court found that there was no contract.

I agree with the majority that there was conflicting evidence of the parties' intent. Maj. op. at 1070. I disagree with the conclusion the majority draws from this evi-

---

**1.** Initially, the majority states that there was "no evidence" supporting any of the three elements of the *Feit* test. Maj. op. at 1070. It later concedes that there was evidence of profit-sharing going to the second element. Maj. op. at 1070.

**2.** § 7–64–202. Formation of partnership:

(1) Except as otherwise provided in subsection (2) of this section, the association of two or more persons to carry on as co-owners a business for profit forms a partnership, *whether or not the persons intend to form a partnership.* A limited liability partnership is for all purposes a partnership. (Emphasis added.)

dence. The facts and documents showing the parties' conduct were sufficient evidence of intent to form a joint venture. The best evidence in favor of finding intent was the conduct of the parties contemporaneous with the two friends assuming the responsibility to help the Ashbys perform the contract to purchase 120 out of 800 acres from the superior landowners. On the other hand, the best evidence negating a finding of intent was the self-serving trial testimony of Perkins regarding mutual understandings that may have been discussed, but not set to paper, approximately thirty years ago. In this case, the intent of the parties was shown by the course of their conduct, not the self-serving testimony, based on faded memories, of Mr. Perkins.

The Ashbys were purchasing the 120 acre parcel under a land contract in 1973 when they had financial difficulties making the payments. Two friends, Stuck and Perkins, "stepped in" to help. The documents that exist and the parties' course of conduct show that they treated the 120 acres as a single parcel until the land contract was paid and title passed to the Ashbys. The parcel then was divided into three 40 acre parcels, and Ashby conveyed two of the parcels to Perkins and Stuck. The documentation supporting the existence of a joint venture was a certificate of limited partnership, correspondence among the three parties, and grazing leases for the entire 120 acre parcel.[3]

The Certificate of Limited Partnership of "Uncompahgre LTD." dated June 14, 1974, states that the "Character of the Business" was "[t]o acquire certain unimproved property" and describes the 120 acres to be acquired. The agreement contains a section detailing how "Profits or Other Compensation" would be shared by the three parties. The certificate expressly treats the 120 acres as a joint interest, evidence that the first element of the *Feit* test was met here.

The second *Feit* element is satisfied by the grazing income derived from the 120 acres shared among the three parties since the inception of their joint interest in the property. There is evidence of this shared revenue in a letter dated April 10, 1975, written by June Ashby to Perkins and Stuck. Mrs. Ashby's letter was addressed "Dear Partners." It detailed the grazing revenue received from the Kinneys, one of the superior landowners, in 1974.

The "Dear Partners" letter shows that taxes on the 120 acre parcel were assessed collectively, that the annual payment for the entire parcel was charged to the parties in one lump sum and then split in thirds, and that the Ashbys checked with the IRS on the "necessity of submitting partnership forms." The letter also shows that the grazing income was not distributed among the three parties, but used in a lump sum to offset the property taxes on the 120 acres. The remainder was equally applied to each partner's portion of the annual payment to the superior landowners. Attached to the letter is a balance sheet detailing the revenues, expenses, taxes, and payments due on the 120 acres. The balances given reflect the entire 120 acres, not 40 acre parcels.

Furthermore, in 1990, another grazing lease was forged between SIR, the petitioner here, and Perkins, Stuck, and Emilia Vargas, Charles Ashby's second wife and successor in interest. The lease gave SIR the right to use the entire 120 acres for grazing without distinguishing among the three 40 acre parcels. Perkins, Stuck, and Vargas signed the document together on the "Lessor" line.

The leasing documents indicate that the three parties considered the 120 acres of land a single, jointly-owned parcel from which they split profits and shared costs. These practices began when the land was purchased in 1974 and continued through the years. The more recent grazing contract is again consistent with the intent that the three parties would share in the revenue gained from the full 120 acre parcel. These documents and the "Dear Partners" letter also evidence the cooperative nature of the

---

3. The trial court found that the three parties did not establish a partnership as to the 120 acres. The trial court, however, focused on "indicia of a formalized partnership." My opinion is that the three friends entered into a joint venture resulting from their course of conduct, not due to an express contract. The certificate of limited partnership is evidence of the parties' cooperation in the management of the entire 120 acre parcel even if they did not meet all the elements of a formal partnership.

conduct, including the pooling of funds and making of payments as a single entity. This conduct satisfies the third element of the *Feit* test.[4]

My second disagreement with the majority is on the existence of an oral contract. An oral contract is only evidenced here by the testimony of an interested party, Perkins, and tangential communications among the Ashbys, Perkins, and Stuck.[5] Even Perkins's own testimony was ambivalent concerning his agreement with the Ashbys. He remarked that his purchase of the property "was always somewhat of an enigma." Maj. op. at 1065. Perkins's lack of understanding about the agreement leads to the conclusion that there could not have been a meeting of the minds to enter into a contract, written or oral, between Perkins and the Ashbys. The trial court found specifically that there was no such contract.

For the reasons discussed above, I believe the evidence in the trial record shows that a joint venture was established by the Ashbys, Perkins, and Stuck. Furthermore, in my opinion, the majority errs in asserting the existence of an oral contract between the parties. The trial court explicitly found that Perkins and the Ashbys had not entered into a contract, written or oral, and there is not sufficient evidence to overturn that finding. Because adverse possession could not have occurred under these circumstances, I respectfully dissent.

---

4. Moreover, while each party had primary use of one 40 acre parcel out of the 120 acres and no doubt expected to acquire legal title when the purchase of the 120 acres was completed, they showed a healthy indifference to boundaries, never bothering to survey the 120 acres or determine accurate subdivisions. (Such indifference to individual property lines ultimately caused this dispute.) This conduct is consistent with joint ownership in the property. The majority cites "[c]orrespondence from the Ashbys [that] described individual tracts with specificity." Maj.

op. at 1070–71. In fact, this "correspondence" was an attachment to the Uncompahgre Certificate of Limited Partnership, which also states that the "Character of the Business" was to acquire the entire 120 acres (see discussion of the certificate above).

5. Part of the correspondence the majority cites in support of the formation of an oral contract is the attachment to the Certificate of Limited Partnership, discussed in this dissent at note 4. Maj. op. at 1070–71.